UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
SAN ANGELO DIVISION

JESUS EDUARDO
JANDRES-ORDONEZ,

      Petitioner,

v.                                                                  No. 6:25-CV-084-H

PAMELA BONDI, et al.,

      Respondents.

### ORDER

Jesus Eduardo Jandres-Ordonez, a native and citizen of El Salvador, entered the United States illegally about ten years ago. ICE detained him in August 2025 and placed him in immigration detention pending removal. An immigration judge denied a bond hearing, citing a lack of jurisdiction. *See Matter of Yajure Hurtado*, 29 I. & N. Dec. 216 (BIA 2025). Jandres-Ordonez is currently detained at the Eden Detention Center in Eden, Texas.

Before the Court is Jandres-Ordonez's petition for a writ of habeas corpus (Dkt. No. 2) and his motion for summary judgment (Dkt. No. 13), which the Court construes as a supplemental claim for habeas relief. Jandres-Ordonez's claims for relief present two overarching arguments. First, he contends that the Central District of California's orders in *Maldonado Bautista v. Santacruz*, No. 5:25-CV-1873, entitle him to a bond hearing. Second, he contends that, at any rate, his detention without bond violates the Immigration and Nationality Act and the Fifth Amendment's Due Process Clause. As a result, he maintains that the government must release him or provide a bond hearing.

But his argument fails on multiple levels. First, the *Maldonado Bautista* orders are advisory opinions. They are not binding on this Court. *See Calderon Lopez v. Lyons*, ___

F. Supp. 3d ___, 2025 WL 3683918, at *7–11 (N.D. Tex. Dec. 19, 2025).  Second, as "[a]n alien present in the United States who has not been admitted," Jandres-Ordonez is an "applicant for admission" subject to Section 1225's mandatory-detention provision.  Third, the history of legislative changes confirms this result.  Previously, aliens who entered illegally without inspection received more rights than aliens who entered lawfully.  By defining "applicant for admission" to include all aliens who have not been admitted and mandating detention for this category, Congress eliminated the prior incentives to enter illegally.  Finally, common sense supports this conclusion.  The law, in Jandres-Ordonez's reading, would mandate detention for aliens who lawfully apply for admission, are caught at or near the border, or seek admission after entering illegally—while aliens who are able to enter illegally and remain undetected for years are entitled to potential release after being caught.  The INA, unsurprisingly, does not bestow heightened procedural protections to illegal aliens based on their stealth and impenitence.

As an "applicant for admission," Jandres-Ordonez must be detained without bond under Section 1225(b)(2)(A).  And his substantive and procedural due process claims fail, too.  Accordingly, the petition and supplemental claim for relief (Dkt. Nos. 2; 13) are denied.

## 1.    Background

Jandres-Ordonez is a native and citizen of El Salvador.  Dkt. No. 12 at 4.  In 2015, as a teenager, he illegally entered the United States with his mother at or near Hidalgo, Texas.  *Id.*  He has remained here since.  *See id.*  In August 2025, ICE detained Jandres-Ordonez and placed him into removal proceedings.  *Id.*; Dkt. No. 2 at 4.  He is currently detained at the Eden Detention Center in Eden, Texas.  Dkt. No. 2 at 2.  A Notice to Appear charged

him with removability as an alien present in the United States without having been admitted and without a valid entry document.  Dkt. No. 12 at 4; *see* 8 U.S.C. §§ 1182(a)(6)(A)(i), (a)(7)(A)(i)(I).

In October 2025, after being detained, Jandres-Ordonez requested a bond hearing before an immigration judge.  Dkt. No. 11 at 8.  That same month, an immigration judge denied his petition citing a lack of jurisdiction.  Dkt. No. 12 at 9.  He did so in reliance on the Board of Immigration Appeals' recent decision in *Matter of Yajure Hurtado*, holding that aliens present in the United States without admission must be detained without bond under Section 1225(b)(2)(A) of the INA for the duration of their removal proceedings. 29 I. & N. Dec. 216, 220 (BIA 2025).

On October 31, 2025, Jandres-Ordonez filed a petition for a writ of habeas corpus. Dkt. No. 2.  The petition states three claims for relief.  First, he alleges that he is a member of the purported class action certified in *Maldonado Bautista v. Santacruz.  See* Dkt. No. 13; *see also* 5:25-CV-1873, 2025 WL 3289861 (C.D. Cal. Nov. 20, 2025) (granting declaratory relief to petitioners).  There, the Central District of California purported to require bond hearings for a Bond Eligible Class consisting of all present and future aliens who entered or will enter the country illegally without being caught, subject to certain limited exceptions.  *See* 5:25-CV-1873, 2025 WL 3288403, at *9 (C.D. Cal. Nov. 25, 2025) (class-certification order).  In a later order, the Central District said that it was vacating an internal government policy mandating detention without bond.  *See* ___ F. Supp. 3d ___, 2025 WL 3713982, at *4 (C.D. Cal. Dec. 18, 2025).  It did not, however, vacate *Yajure Hurtado.  Id.* at *3.

Second, Jandres-Ordonez alleges that his detention without bond violates the INA. Dkt. No. 2 at 6–11.  He argues that Section 1225(b)(2)(A) does not apply to aliens who, like

him, previously entered the United States illegally and have been living in the country prior to being apprehended and placed in removal proceedings. *Id.* at 8–9. In Jandres-Ordonez's view, the proper statutory authority for his detention is Section 1226(a), which permits IJs to release aliens on bond while their removal is pending. *Id.* at 9–10.

Finally, Jandres-Ordonez also contends that his detention without bond violates his due process rights on substantive and procedural grounds. *Id.* at 11–13. He says his detention violates his substantive due process rights because it is "excessive in relation to the regulatory goal Congress sought to achieve" in detaining aliens like him for removal. *Id.* at 11–12 (quoting *United States v. Salerno*, 481 U.S. 739, 747 (1987)). Moreover, he says his detention violates his procedural due process rights in light of the Supreme Court's three-factor balancing test in *Mathews v. Eldridge*, 424 U.S. 319 (1976). *Id.* at 12–13.

The Court ordered the respondents to show cause why Jandres-Ordonez's petition should not be granted. Dkt. No. 4. The respondents answered (Dkt. Nos. 11; 12). Instead of a reply, Jandres-Ordonez filed a motion for summary judgment (Dkt. No. 13), which contains his claim for relief under *Maldonado Bautista*. The Court ordered the respondents to file a response to the motion (Dkt. No. 14), the respondents responded (Dkt. Nos. 15; 16), and Jandres-Ordonez replied (Dkt. No. 17). The Court construes the motion as a supplemental claim for habeas relief. The petition is ripe for review.

## 2.    Legal Standard

"[A]bsent suspension, the writ of habeas corpus remains available to every individual detained within the United States." *Hamdi v. Rumsfeld*, 542 U.S. 507, 525 (2004) (citing U.S. Const. art. I, § 9, cl. 2). With 28 U.S.C. § 2241, Congress authorized federal courts to resolve habeas petitions, including in immigration-detention cases. *Zadvydas v. Davis*, 533

U.S. 678, 687–88 (2001).  Habeas exists solely to "grant relief from unlawful imprisonment or custody."  *Pierre v. United States*, 525 F.2d 933, 935–36 (5th Cir. 1976).  Thus, for the writ to issue, the petitioner must be "in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2241(c)(3); *see Orellana v. Kyle*, 65 F.3d 29, 31 (5th Cir. 1995).  A court considering a habeas petition must "determine the facts, and dispose of the matter as law and justice require."  28 U.S.C. § 2243.

### 3.    Analysis

As noted above, Jandres-Ordonez raises three claims in his habeas petition—one involving the Central District's orders in *Maldonado Bautista*, one involving Sections 1225 and 1226 of the INA, and one based on the Fifth Amendment's Due Process Clause.  His *Maldonado Bautista* claim is similar, if not identical, to the one the Court rejected in *Calderon Lopez*.  *See* 2025 WL 3683918.  His remaining claims are similar or identical to those rejected in *Montelongo Zuniga v. Lyons*, ___ F. Supp. 3d ___, No. 1:25-CV-221, 2025 WL 3755126 (N.D. Tex. Dec. 29, 2025).  Even so, the Court considers the arguments raised in Jandres-Ordonez's briefing to address whether the *Maldonado Bautista* orders govern this case, and whether the bond-less detention of aliens present in the United States without admission violates the INA or the Constitution.  On each count, the answer is no.

### A.    The *Maldonado Bautista* class action does not require this Court to grant relief.

Jandres-Ordonez's first claim rests upon a trio of orders issued by the Central District of California in *Maldonado Bautista v. Santacruz*, No. 5:25-CV-1873.  The *Maldonado Bautista* petitioners were aliens detained by ICE during an operation in Los Angeles.  *Calderon Lopez*, 2025 WL 3683918, at *2.  While the individual petitioners were released in July 2025, the case continued into the fall on the merits.  *See id.* at *3.

– 5 –

First, on November 20, 2025, the Central District issued a declaratory judgment stating that the INA's plain text required the petitioners to receive bond hearings pursuant to Section 1226. *Maldonado Bautista v. Santacruz*, No. 5:25-CV-1873, 2025 WL 3289861, at *11 (C.D. Cal. Nov. 20, 2025). The order did not issue any preclusive relief, and the Central District further declined to enter final judgment. *Id.*

Second, on November 25, 2025, the Central District—still retaining jurisdiction over the matter—certified the Bond Eligible Class, in which Jandres-Ordonez claims membership. *Maldonado Bautista v. Santacruz*, No. 5:25-CV-1873, 2025 WL 3288403, at *9. The purported class consists of all aliens "who (1) have entered or will enter the United States without inspection; (2) were not or will not be apprehended upon arrival; and (3) are not or will not be subject to detention" under Section 1225(b)(1), Section 1226(c), or Section 1231 "at the time [DHS] makes an initial custody determination." *Id.* Upon creating the class, the Central District purported to "extend the same declaratory relief granted to [the] Petitioners to the Bond Eligible Class as a whole." *Id.* Once again, the Central District did not issue preclusive relief or enter a final judgment. *Id.*

Third, on December 18, the Central District entered an order clarifying its relief. The Central District purported to vacate as unlawful the DHS policy to detain illegal aliens under Section 1225 rather than Section 1226. *Maldonado Bautista v. Noem*, No. 5:25-CV-1873, 2025 WL 3713982, at *4.[1] But it expressly declined to vacate *Yajure Hurtado*—which

---

[1] That same day, the Central District entered an omnibus opinion recapitulating its discussion in the prior three orders without making substantive revisions to the prior orders. *Maldonado Bautista v. Santacruz*, ___ F. Supp. 3d ___, No. 5:25-CV-1873, 2025 WL 3713987, at *1 n.1 (C.D. Cal. Dec. 18, 2025). Because this order is the only one currently slated for publication in the Federal Supplement, one would be forgiven for mistaking it as the relevant order governing this case. But since the omnibus order merely describes what already happened in the case without making substantive changes, it is the original three orders that are the proper subject of this petition.

independently prevents immigration judges from holding bond hearings for non-admitted aliens.  *Id.* at *3.

Jandres-Ordonez—an apparent member of the purported Bond Eligible Class—argues that *Maldonado Bautista* requires the Court to demand that the respondents provide him a bond hearing under Section 1226(a) within a week.  Dkt. No. 13 at 6.  Again, the Court previously addressed and rejected this argument in a lengthy order.  *See Calderon Lopez*, 2025 WL 3683918.  Nevertheless, the Court will summarize its reasoning.  Here, as in *Calderon Lopez*, the Court recognizes that it is unusual to address the authority of another court to resolve claims before it.  But doing so is necessary here because Jandres-Ordonez claims these orders are binding upon this Court.  "While the conclusions of another court, when enforced onto a peer court, are generally 'unassailable collaterally,' an exception has always existed for 'lack of jurisdiction.'" *Calderon Lopez*, 2025 WL 3683918, at * 6 (quoting *Treinies v. Sunshine Mining Co.*, 308 U.S. 66, 78 (1939)); *see also Ex parte Watkins*, 28 U.S. (3 Pet.) 193, 202–03 (1830) (Marshall, C.J.) (same).  Thus, the Court considers whether the *Maldonado Bautista* orders are binding upon it.  For three independent reasons, the orders are legal nullities and are not binding on the Court.

First, it is not enough for a court to merely declare something unlawful.  The "oldest and most consistent thread in the federal law of justiciability is that the federal courts will not give advisory opinions." *Flast v. Cohen*, 392 U.S. 83, 96 (1968); *see Calderon Lopez*, 2025 WL 3683918, at *7 (discussing the historical pedigree and purpose of the rule).  Article III sets forth two parallel requirements to prevent advisory opinions: that the claim before the court is redressable and that the court's judgment—not its opinion—must have the power to

"affect the rights of litigants in the case before them.'" *Calderon Lopez*, 2025 WL 3683918, at

*8 (quoting *DeFunis v. Odegaard*, 416 U.S. 312, 316 (1974) (further quotation omitted)).

Here, the key question is whether the Central District's relief had any preclusive

effect on the parties. In other words, can ICE "detain[] aliens without bond today to the

same extent it could on the day before the November 20, November 25, and December 18

orders"? *Id.* at *9. The answer is yes: the Central District's December 18 order "concedes

that '[it] does not apply to vacatur of *Yajure Hurtado*'" because the petitioners' complaint did

not seek *Yajure Hurtado*'s vacatur. *Id.* (quoting 2025 WL 3713982, at *3). Because *Yajure

Hurtado* is binding BIA precedent, all DHS employees are bound to follow its identical

command that aliens like Jandres-Ordonez are subject to mandatory detention. *Id.*; *see* 8

C.F.R. § 1003.1(g)(1).

Any counterargument to the contrary is unpersuasive. The Central District,

recognizing its questionable authority in *Maldonado Bautista*, raised three arguments. To

begin, it remarked that it believed *Yajure Hurtado* was "no longer controlling" and "no

longer tenable" in light of its reasoning. 2025 WL 3713982, at *3. But "that plainly cannot

be the case, because the independent BIA decision was not vacated by the December 18

order." *Calderon Lopez*, 2025 WL 3683918, at *9. Thus, "[t]hat remark is nothing more than

mere opinion. And it can only be the Central District's opinion because, as it conceded, it

could not grant vacatur of a policy that was not challenged in the petitioner's complaint."

*Id.*

Moreover, even assuming the purported vacatur of the DHS policy was within the

Central District's authority, vacatur alone does not confer Article III redressability because

"redress without substance is no redress at all." *Id.*; *see Match-E-Be-Nash-She-Wish Band of*

– 8 –

*Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012) (noting that an APA claimant must still satisfy Article III). So long as *Yajure Hurtado* remains in force, the Central District's purported relief is a nullity.

In addition, the Central District cited the Supreme Court's decision in *Haaland v. Brackeen*, 599 U.S. 255 (2023), for the proposition that it is a court's judgment, not its opinion, that remedies an injury and demonstrates redressability. *See Calderon Lopez*, 2025 WL 3683918, at *9. But *Haaland* stands for nearly the opposite principle. While an opinion itself is not what results in preclusion, a purported judgment without preclusive effect is still advisory and thus non-binding. *See* 599 U.S. at 293–94.

Because the Central District's orders do not offer preclusive relief, they are "contrary to Article III's strict prohibition on issuing advisory opinions." *Id.* at *8 (quoting *Haaland*, 599 U.S. at 294 (internal quotation marks omitted)). That alone prevents the Court from considering them.

Second, the INA deprives the Central District of jurisdiction over the purported class action and challenges to the validity of the bond system. One provision, 8 U.S.C. § 1252(e)(3)(A), provides, "Judicial review of . . . section 1225(b) of this title and its implementation is available in an action instituted in the United States District Court for the District of Columbia," limiting such actions to, among other things, "whether . . . a regulation, or a written policy directive, written procedure issued by or under the authority of the Attorney General to implement such section" is either inconsistent with the INA or otherwise unlawful. Another provision provides that "no court may . . . certify a class under Rule 23 of the Federal Rules of Civil Procedure in any action for which judicial review is authorized under a subsequent paragraph of this subsection"—namely, Section

1252(e)(3)(A). *See* 8 U.S.C. § 1252(e)(1)(B). In other words, both provisions indicate that a challenge to the validity of the DHS policy—as well as a class action to that same end—are only proper in the District for the District of Columbia, not the Central District of California. *See Calderon Lopez*, 2025 WL 3683918, at *10–11.

The Central District tried to distinguish *Maldonado Bautista* as arising under Section 1226, but the plain language of the complaint and the Central District's own reasoning indicate otherwise. *See id.* To object that one statute (Section 1226) should apply when another is being presently applied (Section 1225) admits that the challenge arises under the latter statute. Given the expansive and unambiguous language of the judicial-review provisions, the Central District lacked statutory authorization to declare the policy unlawful. *See Kiakombua v. Wolf*, 498 F. Supp. 3d 1, 33 (D.D.C. 2020) (Jackson, J.) (noting that the provisions "sweep[] broadly" and encompass "DHS internal memoranda" such as the one challenged in *Maldonado Bautista*).

Finally, the unusual structure of the purported relief in *Maldonado Bautista* would necessitate one of two courses of action—denying this petition and ordering Jandres-Ordonez to refile in the Central District or adopting the Central District's reasoning as binding on this Court—both of which would require this Court to rebuke Supreme Court precedent. *Calderon Lopez*, 2025 WL 3683918, at *12–14. The first approach would suggest that Jandres-Ordonez's petition should be denied so it can be pursued in the Central District. *Id.* at *12. But doing so would require this Court to ignore the Supreme Court's admonition that "jurisdiction lies in only one district: the district of confinement." *Id.* (quoting *Rumsfeld v. Padilla*, 542 U.S. 426, 443 (2004)). The other approach—treating the Central District's orders as binding on all other district courts—"is even less acceptable than

the last." *Id.* at *13.  Not only would it act as an end-run on the INA's prohibition against habeas class actions for injunctive relief, *see Garland v. Aleman Gonzales*, 596 U.S. 543, 554–55 (2022), it would also form a type of civil action that strongly resembles the universal injunction, which the Supreme Court rejected in *Trump v. CASA, Inc.*, 606 U.S. 831, 850 (2025).

Thus, the Central District's orders lack authority three times over: because they are advisory, because they were issued in violation of the INA, and because the necessary implications of those orders would require fellow district courts to rebuke the Supreme Court.  Because the Central District acted beyond its authority, its orders are "simply void" and cannot bind this Court.  *Calderon Lopez*, 2025 WL 3683918, at *6 (quoting *Williamson v. Berry*, 49 U.S. (8 How.) 495, 541 (1850) (further quotation omitted)).[2]

**B.    The INA authorizes Jandres-Ordonez's detention without bond.**

Jandres-Ordonez's claim under the INA involves the interplay between two related statutes.  First is Section 1225(b)(2)(A), the INA's mandatory-detention provision.  That provision sets out detention requirements for "applicant[s] for admission" to the United States.  8 U.S.C. § 1225(b)(2)(A).  Specifically, "in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title."  *Id.*  Subject to certain narrow

---

[2] In reply, Jandres-Ordonez acknowledges *Calderon Lopez*, but says the Central District issued an "injunction . . . that agency and relevant officers and employees wherever they act" must obey pursuant to Federal Rule of Civil Procedure 65(d)(2)(C).  Dkt. No. 17 at 8.  That argument is frivolous, as the Central District never described its relief as injunctive.  And had it done so, it would have exceeded its authority under the INA and violated Supreme Court precedent.  *Aleman Gonzales*, 596 U.S. at 554–55.

exceptions discussed below, Section 1225(b)(2)(A) "mandate[s] detention of applicants for admission until certain [removal] proceedings have concluded." *Jennings v. Rodriguez*, 583 U.S. 281, 297 (2018). Nothing in Section 1225 "says anything whatsoever about bond hearings." *Id.*

Section 1226(a), on the other hand, permits discretionary detention. "On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a). Instead of detention, the Attorney General "may" release the alien on bond, "[e]xcept as provided in subsection (c)." *Id.* § 1226(a), (2)(A)–(B). Section 1226(c) in turn requires the Attorney General to "take into custody any alien" who is inadmissible or removable for involvement in certain criminal offenses. *Id.* § 1226(c)(1)(A)–(E); *see Jennings*, 583 U.S. at 303. If Section 1226(c) does not apply, and if an alien is released on bond pending removal, the Attorney General may still re-detain him "at any time." 8 U.S.C. § 1226(b).

The respondents only justify Jandres-Ordonez's detention under Section 1225(b)(2)(A). *See* Dkt. No. 11 at 9. The question, then, is whether Jandres-Ordonez—who surreptitiously crossed the border without inspection and has resided in the United States for years—is an "applicant for admission." 8 U.S.C. § 1225(b)(2)(A). If so, he "shall be detained" without bond. *Id.* If not, he is entitled—at the very least—to a bond hearing under Section 1226(a).

> ### i. As an "applicant for admission," Jandres-Ordonez is subject to mandatory detention without bond under Section 1225(b)(2)(A).

As always, the Court "begins with the statutory text, and ends there as well if the text is unambiguous." *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004). Here, the text is as unambiguous as can be. Section 1225 broadly defines "applicant for admission" as

"[a]n alien present in the United States who has not been admitted or who arrives in the United States." 8 U.S.C. § 1225(a)(1).  Jandres-Ordonez is an "alien."  He is "present in the United States."  He "has not been admitted" because he did not "lawful[ly] ent[er] [the country] after inspection and authorization by an immigration officer." *Id.* §§ 1101(a)(13)(A)–(B) (defining "admission" and "admitted").  As an "applicant for admission" who "is not clearly and beyond a doubt entitled to be admitted," Jandres-Ordonez "shall be detained" under Section 1225(b)(2)(A).  He is not entitled to a bond hearing.

Jandres-Ordonez resists this straightforward conclusion.  He agrees that he is an applicant for admission.  Dkt. No. 2 at 9.  But he says that he is the wrong kind of applicant.  In his view, Section 1225(b)(2)(A) has two requirements: that the alien must be an "[a]pplicant for admission," and that the alien must be "seeking admission."  8 U.S.C. § 1225(b)(2)(A).  An alien is "seeking admission" in his view if he is "standing at the border and asking to be allowed in[to] the United States."  Dkt. No. 2 at 9.  But he is not seeking admission if he has been applying for admission from within the United States "for weeks, months, or years." *Id.* at 8–9.  Why?  Because when it comes to "applicant[s] for admission," the statute requires detention "if the examining immigration officer determines that an alien *seeking admission* is not clearly and beyond a doubt entitled to be admitted."  8 U.S.C. § 1225(b)(2)(A) (emphasis added).  As the argument goes, aliens who have resided in the United States for years after entering illegally are not "seeking admission" to enter and thus are not subject to mandatory detention.  Some courts have termed this as an application "to remain here" rather than to enter, divining special treatment from that

distinction. *Jimenez v. FCI Berlin, Warden*, 799 F. Supp. 3d 59, 71 (D.N.H. 2025) (quotation and emphasis omitted).

This argument suffers from several flaws. Placing hair-splitting emphasis on the phrase "seeking admission" elevates form over substance. As the Court previously explained, "[t]here is no material disjunction—by the terms of the statute or the English language—between the concept of 'applying' for something and 'seeking' something." *Garibay-Robledo v. Noem*, No. 1:25-CV-177, 2025 WL 3264482, at *5 (N.D. Tex. Oct. 24, 2025). An "applicant" is "[s]omeone who requests something." *Applicant*, Black's Law Dictionary (12th ed. 2024). Thus, an "applicant for admission," in ordinary English usage, is one who requests (or seeks) admission into the United States. *See Apply (for)*, Merriam-Webster Thesaurus (noting that to "seek" is a synonym of to "apply" for) (last visited December 17, 2025).[3] It is unclear how an alien can apply for admission without seeking it.

Other parts of Section 1225 illustrate the point. Section 1225(a)(3) provides that "[a]ll aliens . . . [w]ho are applicants for admission *or otherwise seeking admission* . . . shall be inspected." (emphasis added); *see also Shi v. Lyons*, ___ F. Supp. 3d ___, No. 1:25-CV-274, 2025 WL 3637288, at *5 (S.D. Tex. Dec. 12, 2025) (explaining that Section 1225(a)(3)'s "use of 'otherwise' renders 'applicants for admission' a subset of 'seeking admission'—i.e., the former represents one example of the latter"). And Subsection 1225(a)(5) states that "[a]n applicant for admission may be required to state under oath any information sought by an immigration officer regarding the purposes and intentions of the applicant *in seeking admission* to the United States." (emphasis added). The logical import of this phrasing is that an "applicant for admission" is also "seeking admission" under the statute. "Insofar as

---

[3] https://www.merriam-webster.com/thesaurus/apply%20(for) [https://perma.cc/7FNU-M7C9].

the term 'applicant for admission' is more passive than 'seeking admission,' this is inherent in the nature of agent nouns and their corresponding gerunds." *Garibay-Robledo*, 2025 WL 3264482, at *5. As such, Section 1225 cannot be read to limit its application to aliens arriving at the ports of entry.

In fact, if Congress wanted to limit Section 1225(b)(2)(A) to arriving aliens, it could have done so. Neighboring provisions in Section 1225 expressly refer to "arriving alien[s]." *See, e.g.*, 8 U.S.C. §§ 1225(a)(2) ("arriving alien who is a stowaway is not eligible to apply for admission or to be admitted"), 1225(d)(2) (addressing "authority to order detention and delivery of arriving aliens" coming to the United States via vessel or aircraft). Yet Congress did not use "arriving alien" in Section 1225(b)(2)(A). Generally, when Congress "uses certain language in one part of the statute and different language in another, the [C]ourt assumes different meanings were intended.'" *Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004) (quotation omitted). So the fact that Congress did not refer to "arriving aliens" in Section 1225(b)(2)(A), but did so in other parts of the statute, suggests that the mandatory-detention provision is not limited to aliens arriving at the border.

In sum, the Court agrees with the respondents that Jandres-Ordonez is subject to mandatory detention under Section 1225(b)(2)(A). True, he is not an arriving alien. But the statutory text is unambiguous: "[A]n alien present in the United States who has not been admitted"—including those who have been merely paroled—is also an "applicant for admission." 8 U.S.C. § 1225(a)(1). And if an "applicant for admission" is "not clearly and beyond a doubt entitled to be admitted," he "shall be detained" pending his removal proceedings. *Id.* § 1225(b)(2)(A). When a statute is this clear, it must be applied according to its terms. *Carcieri v. Salazar*, 555 U.S. 379, 387 (2009).

– 15 –

ii.     The statutory history of the INA confirms the Court's reading of the mandatory-detention provision.

"Statutory history, 'the record of enacted changes Congress made to the relevant statutory text over time,' can also provide helpful context" for statutory interpretation. *United States v. Moore*, 71 F.4th 392, 395 (5th Cir. 2023) (quoting *BNSF Ry. Co. v. Loos*, 586 U.S. 310, 329 (2019) (Gorsuch, J., dissenting) (emphasis omitted)).  Here, the statutory history of the INA confirms what the plain text already makes clear: aliens who illegally entered the United States and are later apprehended in the interior are "applicant[s] for admission" who must be detained pending removal under Section 1225(b)(2)(A).

In 1996, Congress added the broad definition of "applicant for admission" to the INA in the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA).  Pub. L. No. 104-208, 110 Stat. 3009.  "Prior to the [IIRIRA], the INA assessed status on the basis of 'entry' as opposed to 'admission.'"  *Martinez v. Att'y Gen.*, 693 F.3d 408, 413 n.5 (3d Cir. 2012) (quoting 8 U.S.C. § 1101(a)(13) (1994)).  Under this so-called entry doctrine, aliens who snuck into the United States without inspection were entitled to the procedural and substantive protections afforded in deportation proceedings.  *Id.*  Yet aliens who presented themselves to immigration officials for inspection—say, at a port of entry—were subject to "more summary exclusion proceedings."  *Id.* (quotation omitted).  This distinction—where aliens who followed the rules and presented for inspection were worse off than those who broke the law—created "a perverse incentive to enter at an unlawful rather than a lawful location."  *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 140 (2020).

IIRIRA did away with this anomaly.  Congress replaced the entry doctrine with a criterion based on admission, which it defined as "*lawful* entry . . . after inspection and authorization."  8 U.S.C. § 1101(a)(13)(A) (emphasis added).  Congress also added Section

1225(a)(1)—the definition of "applicant for admission"—and mandated detention for all such applicants while their removal proceedings play out. *See* 8 U.S.C. § 1225(b)(2)(A). By defining "applicant for admission" to include all aliens who have not been admitted, Congress thus eliminated the previous incentives to enter the country illegally.

Jandres-Ordonez's interpretation of Section 1225(b)(2)(A) marks a return to the days before IIRIRA. On his view, aliens who bypass inspection and settle down in the interior have more procedural protections than aliens who present themselves for inspection at the border. *See* Dkt. No. 2 at 8–9. But that, of course, is "the precise situation that Congress intended to do away with by enacting" IIRIRA. *United States v. Gambino-Ruiz*, 91 F.4th 981, 990 (9th Cir. 2024). Thus, the INA's statutory history supports the view that Section 1225(b)(2)(A) requires detention without bond for all applicants for admission—including those who entered the country illegally and have resided here for years.

### iii.    Jandres-Ordonez's counterarguments are not persuasive.

Jandres-Ordonez lodges several additional arguments against applying Section 1225(b)(2)(A). None have merit. He first points to past practice, noting that—until this year—aliens who entered the country illegally and were later placed in standard removal proceedings received bond hearings under Section 1226(a), unless their criminal history made them ineligible. *See* Dkt. No. 2 at 10. Indeed, after IIRIRA, the Executive Office of Immigration Review issued an interim rule explaining that aliens present in the United States without admission are typically eligible for bond. *See Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures*, 62 Fed. Reg. 10312, 10323 (Mar. 6, 1997). That practice continued for several decades. *See*

*Matter of Akhmedov*, 29 I. & N. Dec. 166 (BIA 2025) (applying Section 1226 to an alien

detained inside the United States and ordered removed).

Then, in July 2025, the U.S. Department of Homeland Security distributed an

internal policy (which was later leaked) titled "Interim Guidance Regarding Detention

Authority for Applicants for Admission." *See Maldonado Vazquez v. Feeley*, ___ F. Supp. 3d

___, No. 2:25-CV-1542, 2025 WL 2676082, at *5 & n.2 (D. Nev. Sept. 17, 2025) (describing

the leaked DHS policy and noting that the government did not contest its authenticity). The

policy advised that DHS, in coordination with the U.S. Department of Justice, "revisited its

legal position" and concluded that Section 1225, not Section 1226, "is the applicable

immigration detention authority for all applicants for admission." *ICE Memo: Interim*

*Guidance Regarding Detention Authority for Applications for Admission*, AILA Doc. No.

25071607, Am. Immigr. Laws. Ass'n (July 8, 2025).[4] Thus, DHS maintained the position—

which the BIA later adopted in *Yajure Hurtado*, 29 I. & N. Dec. at 220—that all aliens who

entered the country without admission are ineligible for bond. According to Jandres-

Ordonez, this new policy rejected the well-established understanding of the statutory

framework and reversed decades of practice. *See* Dkt. No. 2 at 10–11.

On close review, this background hurts Jandres-Ordonez more than it helps. The

post-IIRIRA interim rule states that "*[d]espite being applicants for admission*, aliens who are

present without having been admitted or paroled . . . will be eligible for bond and bond

redetermination." 62 Fed. Reg. at 10323 (emphasis added). "The effect of this change," the

rule goes on to explain, "is that inadmissible aliens, except for arriving aliens, have available

---

[4] https://www.aila.org/library/ice-memo-interim-guidance-regarding-detention-authority-for-applications-for-admission [https://perma.cc/5GKM-JYGX]

to them bond redetermination hearings before an immigration judge, while arriving aliens do not." *Id.* The clear implication of this language is that, despite possessing statutory authority to deny bond to all non-admitted aliens, the government previously declined to exercise the full extent of its authority under the INA.

When the current Trump Administration took office, it was free to reconsider the government's position. As the BIA explained in *Yajure Hurtado*, neither "DHS or its predecessor, the Immigration and Naturalization Service, previously rais[ed] the current [detention] issue" before the BIA. 29 I. & N. Dec. at 225 n.6. Therefore, while "for years Immigration Judges have conducted bond hearings for aliens who entered the United States without inspection," *id.*, that past practice was not required by binding case law. No doubt, "the longstanding practice of the government . . . can inform a court's determination of what the law is." *Loper Bright*, 603 U.S. at 386 (citation modified). "But a 'long-established practice' does not justify a rule that denies statutory text its fairest reading." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 329 (2015). Here, the government's past practice of affording bond hearings to non-admitted aliens cannot overcome the text's clear command.

Further, Jandres-Ordonez suggests that the respondents' interpretation of Section 1225 cannot be squared with Section 1226. Dkt. No. 2 at 9–10. To understand the point, some background is helpful. Recall that Section 1226(c) provides exceptions to the discretionary-detention rule. It specifically requires detention of aliens who are inadmissible or removable for involvement in certain criminal offenses. 8 U.S.C. § 1226(c)(1)(A)–(E); *see Jennings*, 583 U.S. at 289. In early 2025, Congress amended Section 1226(c) with the Laken Riley Act. Pub. L. No. 119-1, 139 Stat. 3 (2025). Under the LRA, the Attorney General must detain any alien who (1) is inadmissible for having entered the country without

– 19 –

admission or parole, and (2) is charged with or convicted of specific violent or property-based criminal offenses. 8 U.S.C. § 1226(c)(1)(E)(i)–(ii). The argument goes like this: The LRA requires detention without bond for a subset of non-admitted aliens present in the United States—that is, those responsible for certain crimes. Therefore, it cannot be that Section 1225(b)(2)(A)—enacted nearly 30 years before the LRA—already mandates detention for all such aliens. Otherwise, the LRA's more specific provisions would be superfluous.

For at least three reasons, the Court is unconvinced. First, as Judge Charles Eskridge recently explained, "prior Administrations for decades applied [Section] 1226(a) to individuals like" Jandres-Ordonez. *Cabanas v. Bondi*, No. 4:25-CV-4830, 2025 WL 3171331, at *6 (S.D. Tex. Nov. 13, 2025). Therefore, "at the time of enactment, the Laken Riley Act *did* have [real] effect, given that it *required* mandatory detention for criminal, inadmissible aliens who had not been subject to it . . . by longstanding practice of prior Administrations." *Id.* (emphasis in original). So, the LRA was not meaningless—it narrowed the discretion afforded to any Administration exercising detention authority under Section 1226.

Second, "it is perfectly possible to interpret the provisions" as taking "a 'belt and suspenders approach' to legislation." *Mejia Olalde v. Noem*, No. 1:25-CV-168, 2025 WL 3131942, at *4 (E.D. Mo. Nov. 10, 2025) (Divine, J.) (quoting *Atl. Richfield Co. v. Christian*, 590 U.S. 1, 14 n.5 (2020)). Section 1226(c) regulates when the Attorney General must take aliens into custody. *Id.* Its detention mandate kicks in "when the alien is released, without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense." 8 U.S.C. § 1226(c)(1). Section 1225, on the other hand, does not include a

timeline. *Mejia Olalde*, 2025 WL 3131942, at *4. It only says that the alien "shall be detained." 8 U.S.C. § 1225(b)(2)(A). It is entirely reasonable, then, to interpret the LRA as providing a temporal gloss on the Executive's detention authority. *See Duke v. Univ. of Tex. at El Paso*, 663 F.2d 522, 526 (5th Cir. 1981) (noting that courts should "avoid[]" interpretations "which render parts of a statute inoperative or superfluous"). On that understanding, the LRA adds something that Section 1225(b)(2)(A) lacks.

Lastly, any superfluity, standing alone, is not enough to depart from the clear statutory text. The Supreme Court "has often recognized [that] '[s]ometimes the better overall reading of [a] statute contains some redundancy.'" *Barton v. Barr*, 590 U.S. 222, 239 (2020) (quoting *Rimini St., Inc. v. Oracle USA, Inc.*, 586 U.S. 334, 346 (2019)). More to the point, "[r]edundancy in one portion of a statute is not a license to rewrite or eviscerate another portion of the statute contrary to its text." *Id.* Indeed, the canons of statutory construction should only "be used to resolve remaining ambiguity," not to inject it where it does not exist. *Moore*, 71 F.4th at 395. Because the statutory text is clear, the Court must apply it as written.

One final point. Jandres-Ordonez notes that many district courts across the country have rejected the respondents' position. *See* Dkt. Nos. 2 at 7 n.1; 17 at 2 n.1. That does not, however, make them right. This case turns on the statutory text—not on the opinions of other district courts, no matter how informative they may be.[5] Even so, Jandres-Ordonez's survey of district court authority is not as monolithic as it may seem. Many courts—

---

[5] That includes the *Maldonado Bautista* orders. The Court finds nothing in that decision that would persuade this Court to abandon its present course. The Central District perpetrates the same error as other district courts: ignoring the impact of IIRIRA on the statutory definition of Section 1225(a) and finding superfluity where none exists. *See Maldonado Bautista*, 2025 WL 3289861, at *8–11.

including several in the Fifth Circuit—have concluded that petitioners like Jandres-Ordonez are not entitled to a bond hearing.[6]  Until a higher authority resolves this issue for good, the Court concludes that the INA authorizes mandatory detention for all non-admitted aliens under Section 1225(b)(2)(A).

### C.    The Due Process Clause does not require the government to give Jandres-Ordonez a bond hearing.

Last is Jandres-Ordonez's claim that the government's refusal to provide a bond hearing violates the Due Process Clause of the Fifth Amendment.  He asserts that his detention without bond violates both his substantive and procedural due process rights.  But on either approach, Jandres-Ordonez is not entitled to relief.

Start with substantive due process.  That doctrine protects "only 'those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition.'"  *Dep't of State v. Muñoz*, 602 U.S. 899, 910 (2024) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997)).  While still recognizing due process rights for aliens present in the United States, *see, e.g.*, *Trump v. J.G.G.*, 604 U.S. 670, 673 (2025), the Supreme Court has long affirmed the constitutionality of executive immigration procedures.[7]  The "through line of history," the Supreme Court recently explained, is

---

[6] *See, e.g.*, *Montelongo Zuniga*, 2025 WL 3755126, at *7; *Cabanas*, 2025 WL 3171331, at *4; *Mejia Olalde*, 2025 WL 3131942, at *2; *P.B. v. Bergami*, No. 3:25-CV-2978, 2025 WL 3632752, at *3 (N.D. Tex. Dec. 13, 2025); *Rodriguez v. Noem*, ___ F. Supp. 3d ___, No. 9:25-CV-320, 2025 WL 3639440, at *2 (E.D. Tex. Dec. 10, 2025); *Sandoval v. Acuna*, 6:25-CV-1467, 2025 WL 3048926, at *5 (W.D. La. Oct. 31, 2025); *Vargas Lopez v. Trump*, ___ F. Supp. 3d ___, No. 8:25-CV-526, 2025 WL 2780351, at *2 (D. Neb. Sept. 30, 2025); *Chavez v. Noem*, ___ F. Supp. 3d ___, No. 3:25-CV-2325, 2025 WL 2730228, at *4–5 (S.D. Cal. Sept. 24, 2025).

[7] In asserting that aliens have a substantive due process right to liberty, Jandres-Ordonez "quotes" *Doherty v. Barr*, 503 U.S. 901 (1992).  Dkt. No. 2 at 10.  But *Doherty* is an unreasoned dismissal order.  That said, the error is slight: Jandres-Ordonez appears to be quoting the Second Circuit decision below.  *Doherty v. Thornburgh*, 943 F.2d 204, 208 (2d Cir. 1991).

"recognition of the Government's sovereign authority to set the terms governing the admission and exclusion of noncitizens." *Muñoz*, 602 U.S. at 911–12. To that end, "Congress regularly makes rules that would be unacceptable if applied to citizens." *Mathews v. Diaz*, 426 U.S. 67, 80 (1976).

The principle is no less true for immigration detention. In fact, the Supreme Court has endorsed the constitutionality of detaining aliens without bond during the pendency of removal proceedings. In *Demore v. Kim*, the Supreme Court acknowledged that "the Fifth Amendment entitles aliens to due process of law in deportation proceedings." 538 U.S. 510, 523 (2003) (quoting *Reno v. Flores*, 507 U.S. 292, 306 (1993)). But it clarified that "detention during deportation proceedings" is nevertheless a "constitutionally valid aspect of the deportation process." *Id.* Indeed, "when the Government deals with deportable aliens, the Due Process Clause does not require it to employ the least burdensome means to accomplish its goal." *Id.* at 528. It follows that "the Government may constitutionally detain deportable aliens during the limited period necessary for their removal proceedings." *Id.* at 526. Against that backdrop, the notion that substantive due process requires a bond hearing is untenable.

Jandres-Ordonez's procedural due process claim fares no better. He seeks relief relying on the three-factor balancing test from *Mathews v. Eldridge*, 424 U.S. 319. *See* Dkt. No. 2 at 12–13. The *Mathews* test, while common, is not the only tool for resolving procedural due process challenges. The Supreme Court said as much: "[W]e have never viewed *Mathews* as announcing an all-embracing test for deciding due process claims." *Dusenbery v. United States*, 534 U.S. 161, 168 (2002). In fact, the "Supreme Court when confronted with constitutional challenges to immigration detention has not resolved them

through express application of *Mathews*." *Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1206 (9th Cir. 2022).

The application of *Mathews* to Section 1226 cases is "unwarranted on the test's own terms." *Ladak v. Noem*, ___ F. Supp. 3d ___, No. 1:25-CV-194, 2025 WL 3764016, at *7 (N.D. Tex. Dec. 30, 2025). The Supreme Court applied *Mathews* in *Landon v. Plasencia*, emphasizing that its balancing test was appropriate for "long-time lawful permanent resident[s]" in contrast to "detentions of aliens at the border or returning lawful permanent residents who had spent time abroad." *Id.* (citing 459 U.S. 21, 32–34 (1982)). Aliens in the former category have "gain[ed] admission to our country and [have begun] to develop the ties that go with permanent residence," meriting a level of due process more analogous to that of a citizen. *Landon*, 459 U.S. at 32. In the latter category, aliens "request[] a privilege and [have] no constitutional rights." *Id.*; *DHS v. Thuraissigiam*, 591 U.S. 103, 138–39 (2020) ("Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned.") (quotation omitted). Critically, aliens who are released into the United States pending removal are "treated for due process purposes as if stopped at the border." *Thuraissigiam*, 591 U.S. at 139.

As an "applicant for admission," Jandres-Ordonez has "only those rights regarding admission that Congress has provided by statute." *Thuraissigiam*, 591 U.S. at 140; *Landon*, 459 U.S. at 32. With Section 1225, Congress set the procedural rights afforded to aliens who are present in the United States without admission. "Read most naturally," Section 1225(b)(2)(A) "mandate[s] detention of applicants for admission until certain proceedings have concluded." *Jennings*, 583 U.S. at 297. No part of the statute "says anything

– 24 –

whatsoever about bond hearings." *Id.* Accordingly, Jandres-Ordonez is not entitled to a bond hearing as a matter of procedural due process.

**4.    Conclusion**

In sum, the Court is not bound by the Central District's advisory opinions, it cannot require that Jandres-Ordonez receive a bond hearing when he is otherwise subject to mandatory detention under the INA, and a bond hearing is not required as a matter of due process. Thus, the petition and supplemental claim (Dkt. Nos. 2; 13) are denied.

So ordered on January 23, 2026.

_____
JAMES WESLEY HENDRIX
UNITED STATES DISTRICT JUDGE